UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LUIS R. ZAMOT,

                              Plaintiff,                                    DECISION & ORDER

                    v.                                                     08-CV-6233P

MONROE COUNTY DEPARTMENT OF
HUMAN SERVICES,

                              Defendant.
_____


## PRELIMINARY STATEMENT

Plaintiff Luis Zamot, acting *pro se*, has filed suit against his former employer

under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. Zamot alleges that he was

subjected to a hostile work environment based upon his gender during his employment as a legal

assistant with the Monroe County Department of Human Services (the "DHS"). (Docket # 1).

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a

magistrate judge. (Docket # 13).

A bench trial was conducted before this Court in November 2009.[1] Zamot

testified on his own behalf and elicited testimony from three witnesses with whom he worked in

the DHS: legal assistant Kimberly Sekelsky; senior legal assistant Margaret Michniewicz; and

senior examiner Robert Snead. The defense called four witnesses: New York State

Administrative Law Judges Katharine Volk and Victoria Venn; Craig Roth, the supervisor of the

_____

[1] The transcripts of the trial proceedings on November 2, 2009, November 3, 2009 and November 4, 2009,
shall be referred to herein as "Tr. A," "Tr. B" and "Tr. C," respectively. (*See* Docket ## 34-36).

DHS's Fair Hearing Office; Amy Doescher, a legal assistant; and Susan Walsh, former Deputy Director of the Monroe County Department of Human Resources. Based upon the findings of fact set forth below, and for the reasons explained more fully below, judgment is granted in favor of the defendant.

## FINDINGS OF FACT

### I. Zamot's Hiring and First Two Days in the Fair Hearing Office

In May 2005, the County of Monroe (the "County") hired Zamot as a legal assistant assigned to the DHS's Fair Hearing Office (the "FHO"). (Tr. A 10; Tr. B 36; Exhibit ("Ex.") 1). Zamot was responsible for representing the County at administrative hearings, known as "fair hearings," held before New York State administrative law judges to determine whether the County is properly administering various public assistance and benefits programs.[2] (Tr. B 44, 78-80). Zamot later learned that the decision to hire him was made not by the FHO, but by the County's Law Department. (Tr. A 10, 31).

When he was hired, Zamot was the only male legal assistant in the FHO, but not the only male employee in the office. Craig Roth, a male, was Zamot's supervisor and Robert Snead, another male, joined the FHO as a senior examiner in February 2006. (Tr. A 20-21, 171; Tr. B 112). Throughout his twenty-seven month tenure in the FHO, all of Zamot's fellow legal assistants were women. (Tr. A 18, 171; Tr. C 14-15).

---

[2] Fair hearings may be requested by a recipient of or applicant for public assistance benefits in order to review any adverse decision made by the County regarding that individual's benefits or application for benefits. (Tr. B 78-80, 85).

Zamot's first day of work was May 31, 2005. (Tr. A 10). On that date, he reported directly to the building in which fair hearings were held in order to observe senior legal assistant Margaret Michniewicz ("Michniewicz") represent the County in hearings that day. (Tr. A 10). Before the hearings began, Zamot met Michniewicz and another legal assistant, Kimberly Sekelsky ("Sekelsky"). (Tr. A 11, 90, 119). Zamot recalled that Sekelsky left the building before any hearings began, which Zamot believed revealed that her only purpose there had been to socialize with Michniewicz. (Tr. A 12, 16; Tr. C 2-3). Sekelsky credibly explained, however, that she was there that morning because she had a case that was scheduled on the calendar, but the client did not appear and the hearing was cancelled. (Tr. A 90-91).

The interaction between Zamot and Michniewicz that morning left them with very different impressions. Michniewicz testified that Zamot "made a very good first impression." (Tr. A 134). Specifically, she remembered that "he seemed confident, . . . dress[ed] well [and] sp[oke] well." (*Id.*). Zamot, by contrast, recounted several incidents that left him with an unfavorable impression of Michniewicz and the FHO environment he was joining. He testified, for example, that Michniewicz had appeared upset with him when she noticed him reviewing her case files – an action that he took when one of the judges asked him to look for a file while Michniewicz was absent from the hearing room. (Tr. A 15-16). Zamot also testified about two comments that he found off-putting. First, in response to his observation that he was looking forward to helping clients, Michniewicz stated that their work was not "social work" and reminded him that their duty was to follow the regulations. (Tr. A 11, 124). The second comment that Zamot found disconcerting was Sekelsky's statement that she hoped he would not

mind "talking loud over the cubicles [in the FHO office] . . . because there's a lot of conversation going on." (Tr. A 12, 14).

The following day, Zamot reported to the County's FHO office. (Tr. A 17). Because Zamot had spent his entire first day away from the office, Michniewicz took him around the office to introduce him to the other legal assistants. (Tr. A 18). She introduced him as the "new Barb," referring to the name of the legal assistant whom Zamot had been hired to replace. (Tr. A 18, 135-36). Michniewicz explained that it was common practice in the FHO to introduce a new employee by reference to the former employee whom the new employee was replacing, and she did not intend her introduction to be offensive. (Tr. A 135-37). Several witnesses testified that "Barb" had been a well-liked and well-respected employee. (Tr. A 157-58; Tr. B 129).

Zamot testified that Michniewicz's introduction made him uncomfortable and he corrected her during her third introduction, stating, "my name is Luis."[3] (Tr. A 18). Michniewicz testified that Zamot merely corrected her pronunciation of his first name because she had called him "Louis," rather than "Luis." (Tr. A 138). Zamot described the effect that Michniewicz's introduction had on him: "[T]hat gave me another flavor, another indication as to . . . the beginning of a hostile environment. . . . It did not leave a good flavor in terms of . . . interpersonal relationships within the unit." (Tr. A 18).

When Zamot later learned that his hiring decision had been made by the County's Law Department, he concluded that the FHO staff's unwelcoming attitude must have reflected

---

[3] The record contains no evidence that Zamot's co-workers or supervisors ever again referred to him as "the new Barb" or by any name other than his own.

4

their frustration over their lack of input into the decision to hire him. (Tr. B 21). To the contrary, however, both Michniewicz and Craig Roth ("Roth"), Zamot's supervisor, testified credibly that Zamot's hiring was greeted enthusiastically by the staff, who were eagerly awaiting the hiring of another colleague with whom to share their workload. (Tr. A 132; Tr. B 129). Roth also noted that it was not unusual for employees to be hired for the FHO without input from FHO staff. (Tr. B 127).

## II. Zamot's Relationships with his Colleagues

### A. The Office Atmosphere

When Zamot began working in the FHO, he was assigned to a cubicle between Sekelsky and Amy Doescher ("Doescher"), another FHO legal assistant. He quickly became aware that Sekelsky's cubicle was a location where other legal assistants would gather to converse, sometimes in quiet tones. (Tr. A 19, 20, 100-101). Zamot refrained from joining their conversations, which he found distracted him from his work. (*Id*.). In addition, Sekelsky frequently discussed cases with Doescher by speaking over Zamot's cubicle; Zamot never told her that their conversations bothered him. (Tr. A 104).

On August 13, 2005, Zamot complained to Roth about the noise around his cubicle and requested permission to use "comp time" to complete work that he had been unable to finish because of the noise. (Tr. A 20, 171). According to Zamot, Roth replied by asking Zamot whether he had thought about "getting ear plugs." (Tr. A 20). According to Roth, he replied that Zamot should ask them to speak more softly. (Tr. B 130).

In the spring of the following year, Doescher resigned her employment and Sekelsky received Roth's permission to move to another cubicle in a different area within the office. (Tr. A 44, 102-103, 108-109). Sekelsky explained that she moved because she "no longer had anyone to discuss cases with." (Tr. A 103). Zamot did not indicate to Sekelsky that her move upset him. (Tr. A 103-04).

**B. August 2005 Dispute with Michniewicz**

On August 31, 2005, while Roth was on vacation and Michniewicz was acting supervisor, Zamot approached Michniewicz near her cubicle to discuss a case. (Tr. A 22). Before he spoke, Michniewicz told him that she had something that she wanted to "take up" with him and proceeded to question him about why he had not adequately prepared a case, which had caused her to be unprepared for a hearing. (Tr. A 24-25, 141, 152). According to Zamot, he apologized and sought clarification concerning what he should have done to prepare the case, but Michniewicz reacted angrily and condescendingly. (Tr. A 25). Zamot testified that he told Michniewicz that she sounded angry, to which she replied, "I know your tricks," "I have taken management courses, as well" and "you're trying to interrupt me." (Tr. A 25). By contrast, Michniewicz described Zamot's response as defensive and antagonistic. (Tr. A 142).

Zamot later returned to Michniewicz's cubicle to ask Michniewicz when she first noticed that the case had not been prepared. (Tr. A 25). When Michniewicz gave him the date, Zamot responded that she had had enough time to communicate with him about the case before the hearing. (*Id.*). Michniewicz repeatedly emphasized that it was his responsibility to prepare the case and eventually told him to leave her cubicle. (Tr. A 26). Zamot characterized Michniewicz's behavior as a "bullying tactic [designed to] display[] power, control and

6

arrogance," which caused him embarrassment because it had occurred within earshot of the other legal assistants. (Tr. A 26; Tr. C 4).

Michniewicz recalled that Zamot returned to her cubicle a second time to rehash the topic, this time when no other employees were nearby. (Tr. A 144-45). Michniewicz testified that Zamot yelled at her and she felt threatened by him during this encounter. (Tr. A 144, 147). She told him to leave her cubicle three times before he finally left. (Tr. A 145). Despite her apprehension about Zamot's behavior, Michniewicz testified that she never told Roth about the incident because the conflict did not continue after that day and she wanted to "give Zamot a break" as a new employee. (Tr. A 145-46, 149).

### C. **Zamot's Interactions with Other Employees**

Both parties agree that Zamot had minimal interactions with his colleagues during his tenure in the FHO, but they dispute the cause. (Tr. A 159-60, 180; Tr. B 107). On the one hand, Zamot testified that he felt ostracized by the female legal assistants. (Tr. C 15). On the other hand, his fellow employees testified that they often felt demeaned by Zamot when they tried to help him. (Tr. A 112, 114, 158-59). This led them to communicate with him only when necessary. (Tr. B 106, 115, 140). Zamot admitted that he stopped talking to Michniewicz at some point during his tenure, which created an understandably difficult relationship.[4] (Tr. A 159-63; Tr. B 40). Michniewicz testified that despite those difficulties, their relationship eventually improved and evolved into "a semi-working relationship." (Tr. A 165).

---

[4] Zamot testified that he met with Roth's supervisor, Nancy Forgue, on one occasion in early 2007 to discuss his relationship with Michniewicz and other colleagues. (Tr. A 68). According to Zamot, Forgue began the meeting by asking him why he had such a "poor image" in the FHO. (Tr. A 68-69). Although Zamot was offended by this comment, he hoped that their discussion would prove productive in the long run. (Tr. A 70-71). Forgue told Zamot that she would speak further with Michniewicz and Roth, leading him to believe that she would meet again with him. (Tr. A 71). The next time she met with him, however, was the day he was terminated. (*Id*.).

Robert Snead ("Snead"), a male employee who transferred to the FHO in February 2006 and became friendly with Zamot, observed that Zamot had "minimal," but "professional" contact with the female legal assistants. (Tr. A 180, 188). Snead did not find those relationships to be unusual, however, and never observed any conduct on the part of Zamot's colleagues that suggested any gender bias against him. (*Id*.). Indeed, based upon Snead's more than twenty years of employment within the DHS, he concluded that the "culture" in the FHO was "probably one of the best in the agency." (Tr. A 178).

## III.  Zamot's Job Performance and Termination

### A.  Zamot's Annual Performance Evaluations

During his twenty-seven months in the FHO, Zamot received two annual performance reviews by Roth. (Tr. A 28; Exs. 7-F, 7-G). Both reflected a substantial majority of "average" ratings, with a few "above average" ratings. (Exs. 7-F, 7-G). Roth included narrative comments about Zamot's job performance in each evaluation, none of which were negative. (*Id*.). In both evaluations, Roth opined that Zamot performed his job "adequately." (*Id*.).

Despite the evaluations' ratings, Susan Walsh ("Walsh"), the Deputy Director of Human Resources, characterized them as "probably two of the lowest-rated performance evaluations" she had seen, due to the DHS's practice of "evaluating and escalating" ratings. (Tr. B 156). Roth testified that Zamot's ratings were in fact inflated because he was afraid to rate Zamot's performance as below average. (Tr. B 125). Roth explained that he feared he would lose his job if he issued honest appraisals of Zamot's work as a result of the "political connections" that he perceived Zamot had. (Tr. B 125).

8

### B. **Zamot's Case Preparation**

Roth, Michniewicz, Sekelsky and Doescher all testified that Zamot's preparation of cases for hearings was generally poor.  (Tr. A 111, 158; Tr. B 106, 139).  According to them, Zamot often misidentified the issues for the hearings or stipulated to positions that were not supported by the agency's record.  (Tr. A 158, 161; Tr. B 106, 139; Ex. 9-B).  Each testified that Zamot reacted poorly when they attempted to discuss the errors with him and teach him how to address those issues in the future.  Specifically, they described Zamot's responses to their efforts as "argumentative" (Tr. B 114), "[dis]agreeable" (Tr. A 112), "defensive" (Tr. A 159) and "condescending" (Tr. A 159; Tr. B 106).

Doescher recalled that she complained to Roth about Zamot's preparation of one case in particular, and he instructed her to explain the issues to Zamot.  (Tr. B 106).  When she did, Zamot initially appeared to respond professionally, but returned after he had worked on the case, handed her the file and stated, "I hope this meets your high expectations."  (*Id*.).

Roth recalled an occasion in which he attempted to explain to Zamot that he had used the term "stipulate" improperly.  As he recounted:

> You had wr[itten] on your summary the agency stipulates that the notice is time [barred].  I brought it to you saying, yes, you have a good time bar, but you used the word "stipulation" in the wrong place.  This is not a stipulation.  This is an argument we have to use at the hearing.  You argued as to what stipulation meant.  I explained to you no, that was wrong.  You then came back to my office three times trying to convince me that your definition of stipulation was correct until you finally brought the dictionary and you opened it up.  And when you read what the definition was, you finally walked away sheepishly because it showed that you were incorrect.

(Tr. B 139).  In Roth's view, Zamot's response was consistent with his "argumentative" reaction on most occasions when Roth approached him to "try to point out mistakes that had been made to help him correct those mistakes."  (Tr. B 114, 139).

### C.  Zamot's Conduct in Hearings before Female Administrative Law Judges

As two female New York State administrative law judges testified, Zamot's demeanor before them in fair hearings was often disrespectful and unprofessional.  (Tr. B 78-83, 87-100).  Judge Katharine Volk ("Volk") recalled presiding over one hearing in which Zamot was the County's representative.  (Tr. B 78).  She remembered that he had not properly identified the single issue for review in the hearing, and thus appeared for the hearing unprepared to address that issue.  (Tr. B 79-80).  She recalled that when she made requests to him in that hearing, he responded by stating, "10-4," which struck her as disrespectful and "mocking." (Tr. B 81).  After the hearing, she complained to her supervisor about Zamot's conduct during the hearing.  (Tr. B 83).

Judge Victoria Venn ("Venn") testified that Zamot "quite often was not well prepared" for hearings and seemed to have difficulty understanding the issues.  (Tr. B 87).  She found his demeanor before her to be "condescending, confrontational, . . . [and] patronizing." (*Id*.).  She recalled one hearing in June 2007 in which Zamot refused to comply with her request to bring someone from the hall into the hearing room.  (Tr. B 94).  Venn then told Zamot that she was going to file a complaint about him, and he responded that he would do likewise about her. (Tr. B 95-97).  Venn ultimately determined that she could no longer work with Zamot and complained to her supervisor about him.  (Tr. B 87-89).  Zamot testified that he did not refuse to comply with her request at this hearing, but rather mistakenly handed her the wrong file, causing

her outburst. (Tr. B 16-17). He admitted that he stated to Venn, "If you make a complaint about me, I will complain about you." (Tr. B 17).

On July 27, 2007, Venn's supervisor, Philip Nostramo, wrote a memorandum to Nancy Forgue, a supervisor in the DHS,[5] complaining about Zamot's job performance and demeanor. (Tr. B 115; Ex. 409). Specifically, the memorandum stated that the administrative law judges before whom Zamot appeared had the "unanimous impression . . . that [he] lacks the competence of the other county representatives." (Ex. 409). The memorandum further stated that the female judges found him to be "condescending . . . in both speech and facial expressions" and stated that he "makes inappropriate comments to the ALJs and is otherwise disrespectful." (Ex. 409). Despite Nostramo's request that Forgue discuss the issues with Zamot, Zamot first learned of the memorandum on August 28, 2007, after he had been notified of the County's intent to terminate him. (Ex. 409; Tr. B 18).

### D. Time and Attendance Issues

In April 2006, Zamot attended a non-disciplinary "informal counseling" meeting with Roth to address issues concerning Zamot's work hours. (Tr. A 50; Tr. B 39, 117; Exs. 8A, 8B). Roth's supervisor, Nancy Forgue, directed Roth to conduct the counseling with Zamot in order to address a complaint that Zamot had left work early without requesting permission. (Tr. A 51; Tr. B 117). During the meeting, Roth instructed Zamot that he could not work through lunch and leave early unless he obtained approval in advance from Roth or, in his absence, Michniewicz. (Tr. A 52; Ex. 8B). Roth's reminder was also consistent with a written time and attendance policy that had been issued by Roth earlier that month. (Tr. A 45; Tr. B 39,

---

[5] Forgue's position was not identified at trial.

116; Ex. 8).  Roth informed Zamot that he intended to meet with him again in thirty days to review his compliance, but that meeting never occurred because Zamot complied with the policy during that time frame.  (Tr. A 52; Tr. B 150).

On January 23, 2007, Roth sent Zamot an email reminding him of the need to request permission before leaving work early.  (Ex. 403).  Roth's email addressed two incidents, one of which was Zamot's unapproved early departure the previous day when Roth was out of the office.  (Tr. B 11; Ex. 403).  Zamot responded to Roth by memorandum in which he admitted that he had not sought Michniewicz's permission and stated that he would comply with the policy in the future, but accused Michniewicz of "unprofessional" demeanor and "petty tyranny" in connection with a request he had made five month earlier.  (Tr. B 11-12; Ex. 4).  He attached to the memorandum the string of emails relating to this previous request, which he complained made him feel as if Michniewicz was "prosecuting a [f]air [h]earing and [he was] the [a]ppellant instead of her [a]ssociate."  (*Id*.).

The exchange of nine emails, all of which occurred within a two and a half-hour period on August 28, 2006, began with the following communication from Zamot to Michniewicz:

> On Friday 8/25, I banked one hour of comp-time – no lunch – please adjust.
>
> On Friday, 9/1, I intend to work 1/2 day and use comp-time to cover the balance of my day.   Thanks.

(*Id*.).  Michniewicz responded that she was "a little confused" by his request for an hour of "comp" time and "need[ed] him to explain [his] claim of no lunch" since she had seen him that day and knew he was not conducting hearings.  (Ex. 4).  He replied that he had worked through

lunch, and Michniewicz responded that she would "have to check to see if we can authorize overtime under those circumstances." (*Id*.). With respect to Zamot's second request, Michniewicz inquired, "As for 9/01, are you requesting to work through your lunch and leave early?" (*Id*.). Zamot replied, "Don't bother, it's a non-issue for me. No." (*Id*.). Michniewicz nonetheless promptly approved both of his requests in brief, courteous emails. (Ex. 4; Tr. B 34-35).

Zamot adduced no evidence that Roth or Michniewicz ever denied his requests to work through lunch and leave early, and indeed the evidence suggests the opposite. (Tr. A 54-58; Exs. 8I, 8J, 8N, 8O, 8P, 8Q). Neither side offered any evidence concerning whether other employees worked through lunch and left early and, if so, whether they were treated differently from Zamot when they did.

### E. Zamot's Termination

On August 15, 2007, Zamot was summoned to a meeting with Nancy Forgue and Robert Franklin, then-Director of the DHS's Financial Assistance Division, at which time he was handed a letter advising him that he was being terminated. (Tr. A 77-78; Ex. 10-A). The letter stated that the reason for his termination was that his "performance as a Legal Assistant [was] not meeting the expectations of the Department." (Ex. 10-A). The meeting lasted approximately one hour. (Tr. B 20).

Subsequent to the letter, a dispute arose between the County and the union over whether Zamot, as a "provisional" employee, was entitled to pre-termination "investigatory interview" under the terms of the collective bargaining agreement. Walsh, the Deputy Director of the Department of Human Resources, ultimately decided to grant the union's request for an

investigatory interview in Zamot's case. (Tr. B 157). Zamot was provided a memorandum on August 28, 2007, scheduling the interview for August 31, 2007. (Ex. 11). The memorandum stated, "[t]he interview involves allegations that you are condescending towards female Administrative Law Judges in both speech and facial expressions, and their lack of confidence in your ability to represent the agency." (*Id*.).

The investigatory interview occurred on August 31, 2007. (Tr. B 36, 40-41). Walsh presided over the meeting, which Zamot attended, accompanied by a union representative.[6] (Tr. B 160, 162). They discussed issues that were identified in a memorandum that was provided to Zamot at the beginning of the meeting, which included his case preparation, performance and demeanor at fair hearings, demeanor towards female administrative law judges and co-workers and time and attendance issues. (Tr. A 74, 83; Tr. B 54, 160; Ex. 11A). Zamot felt unprepared to respond to the issues because they "became known to [him] for the very first time at that meeting." (Tr. A 84).

Following the August 31 meeting, Zamot received a letter from Robert Franklin dated September 4, 2007, informing him that he was being terminated "for cause based on performance and conduct as discussed at the interview." (Ex. 11-B). Walsh testified that Zamot was terminated by the County's Commissioner of Social Services upon Walsh's recommendation, which was based upon her assessment of his work performance, the administrative law judges' complaints and the investigatory interview. (Tr. B 151-52). Roth testified that neither he nor Michniewicz participated in the decision to terminate Zamot's employment. (Tr. B 117).

---

[6] No evidence was offered as to whether any other individuals attended the meeting.

**IV.  Absence of Gender Bias Complaints**

Zamot adduced no evidence that he ever complained to anyone in the DHS that he was being discriminated against or treated differently based upon his gender.  In fact, both Roth and Michniewicz testified that Zamot never made such a complaint to them.  (Tr. A 159; Tr. B 112).

**DISCUSSION**

Title VII proscribes discrimination on the basis of gender in the "terms" and "conditions" of employment.  42 U.S.C. § 2000e-2(a)(1).  One form of such prohibited discrimination is "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  Hostile work environment claims require scrutiny of the "workplace environment as a whole to discover whether it is 'abusive.'"  *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. at 22).

To prevail on a hostile work environment claim under Title VII, a plaintiff must establish:  (1) that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment," and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.  *Harris*, 510 U.S. at 21 (internal quotation omitted); *see also Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir.), *cert. denied*, 540 U.S. 1016 (2003); *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).  "It is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must

15

demonstrate that the conduct occurred because of [his] sex." *Alfano v. Costello*, 294 F.3d at 374 (internal quotation omitted); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). In other words, when harassment becomes "so severe or pervasive that it create[s] a work environment abusive to employees because of their . . . gender . . . , [such conduct] offends Title VII's broad rule of workplace equality." *Harris*, 510 U.S. at 22.

The test for hostile work environment has "objective and subjective elements," *Alfano*, 294 F.3d at 374, requiring a plaintiff to demonstrate both that he perceived the environment to be abusive and that the environment was "objectively hostile and abusive." *Harris*, 510 U.S. at 21. *See also Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). A plaintiff may make this showing by establishing either that a single incident was extraordinarily severe or that a series of incidents were "sufficiently continuous and concerted" to be deemed pervasive. *Alfano*, 294 F.3d at 374 (internal quotation omitted); *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997). "Whether an environment is 'hostile' or 'abusive' depends on the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

The harassing conduct giving rise to a hostile work environment claim "need not be motivated by sexual desire," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), but it must "be based on sex." *Pucino v. Verizon Commc'ns, Inc.*, 2010 WL 3191433, *4 (2d Cir. 2010) (internal quotation omitted). Where, as here, the claim is based upon conduct alleged to reflect gender-animus rather than sexual desire, it may be proven by:

> "harass[ment] in such sex-specific and derogatory terms . . . as to
> make it clear that the harasser is motivated by general hostility to
> the presence of [persons of the opposite sex] in the workplace,"
> *Raniola*, 243 F.3d at 621 (internal quotation omitted), or by
> offering "some circumstantial or other basis for inferring that
> incidents sex-neutral on their face were in fact discriminatory[,]"
> *Alfano*, 294 F.3d at 378.

*Id*. at *4 (alteration in original). The critical inquiry is thus "whether members of one sex are

exposed to disadvantageous terms or conditions of employment to which members of the other

sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. at 80 (internal

quotation omitted).

Judged under the authority set forth above, Zamot has failed to satisfy his burden

of demonstrating that he was subjected to a hostile work environment based on his gender. The

credible trial proof simply contains no evidence that Zamot's co-workers or supervisors harassed

Zamot, let alone that they did so because he was male. Because I find that the record is bereft of

*any* proof of discriminatory abuse, it is necessarily bereft of any proof that defendant's treatment

of Zamot was so "severe or pervasive [as] to alter the conditions of [his] work environment."

*See Harris*, 510 U.S. at 21.

Zamot has adduced no proof that any of his co-workers or supervisors ever

harassed him in "sex-specific and derogatory terms." *Raniola*, 243 F.3d at 621 (quoting *Oncale*,

523 U.S. at 80). For example, the trial record contains no evidence that he was the target of any

gender-based comments, sexual innuendo or jokes. Although he cites Michniewicz's

introduction of him as the "new Barb," I do not find that her comment was "motivated by general

hostility to the presence of [men] in the [FHO]," *id.*, or that it was intended to be insulting at all.

Michniewicz explained that she introduced Zamot as the "new Barb" in order to identify him as

the employee who was hired to replace Barb, a well-liked and respected former legal assistant. Indeed, Michniewicz and Roth both testified that the FHO staff were excited by Zamot's hiring because they needed help with their caseload. Moreover, there is no evidence that Michniewicz or any other employee ever referred to him as the "new Barb" after that morning.

Nor do I find that Zamot was treated more harshly than his female co-workers in the workplace. *See Pucino*, 2010 WL 3191433 at *4 (proof of hostile work environment may consist of evidence that persons of one gender were subjected to disparately harsh working conditions). The trial record demonstrates that Zamot was given the same work assignments as the female legal assistants. Like them, he was responsible for representing the County at fair hearings and preparing cases for those hearings. The evidence further shows that his workload was comparable to theirs; each legal assistant was expected to cover approximately twenty cases per hearing day. (Tr. B 142). *Raniola*, 243 F.3d at 621 (proof of hostile work environment included evidence of "disproportionately burdensome work assignments"). There is no evidence suggesting that his training was inferior to that afforded to female legal assistants; in fact, Zamot himself testified that Roth trained him well. (Ex. 7; Tr. A 30). Finally, Zamot's physical work space – a cubicle in an open area – was identical to that assigned to the other legal assistants.

Zamot's suggestion that the attendance policy was enforced more harshly with him than with his female co-workers is not supported by the evidence. Although Roth counseled Zamot about the need to obtain his or Michniewicz's approval to work through lunch and leave early, that requirement applied to all FHO employees under the 2006 written policy, and Zamot has offered no evidence that it was enforced only against him. *See Alfano*, 294 F.3d at 375 (under hostile work environment theory, "a plaintiff must prove that [he] was singled out for

mistreatment because of [his] sex").  Nor has he tendered any evidence that Roth or Michniewicz discriminatorily denied his requests to leave early; indeed, the proof suggests that they consistently approved his requests.  The only example to which Zamot points as proof of Michniewicz's "petty tyranny" in enforcing the policy against him – the August 2006 email exchange – reflects no evidence of gender-animus by Michniewicz towards Zamot.  Rather, the few questions posed by Michniewicz in response to Zamot's request were appropriate and professionally articulated, and resulted in the prompt approval of his request.

The credible evidence further establishes that the occasional conflicts that arose between Zamot and his co-workers were not gender-related, but rather were related to his work performance.  Each of the witnesses testified that Zamot's case preparation was poor and that he consistently resisted their efforts to help him by responding in an argumentative, defensive and condescending manner.  Insofar as these unproductive interactions led Zamot's colleagues to avoid unnecessary contact with him, the reason was not because they were biased against him because he was male, but because they found discussing cases with him to be so difficult.  *See Oncale*, 523 U.S. at 80 (Title VII not intended to be "a general civility code for the American workplace"); *Wilson v. Family Dollar Stores of N.Y., Inc.*, 2008 WL 4426957, * 9 (E.D.N.Y. 2008) (evidence that employee and manager "did not work well or like each other" does not prove gender discrimination under Title VII), *aff'd*, 374 F. App'x 156 (2d Cir. 2010); *Serrano v. Runyon*, 1997 WL 718976, *3 (D. Conn. 1997) ("[d]iscord based on personality conflicts between co-workers or between a supervisor and an employee is not actionable under Title VII").

As proof that the staff was biased against him because of his gender, Zamot relies heavily on the incident that occurred between Michniewicz and him in late August 2005 in which

they argued about his preparation of a particular case. Despite Zamot's characterization of Michniewicz's behavior as "bullying," it was he who returned to her cubicle twice to revisit the issues (after Michniewicz thought they had been adequately addressed), the last time ignoring her requests to leave. Although Michniewicz's dissatisfaction with Zamot's case preparation might have been addressed in a more constructive and private manner, her single public confrontation with him over his performance is not evidence of gender-animus. *See Wilson v. Family Dollar Stores of N.Y., Inc.*, 2008 WL 4426957 at *7 ("[w]hile [a supervisor's] behavior may be rude and unprofessional, it merely indicates personal enmity rather than discrimination and thus does not violate Title VII"). Indeed Roth testified that Zamot reacted in a similar manner when he tried to instruct him as to the proper use of a stipulation.

Turning finally to Zamot's termination, I do not find that it – taken alone or in combination with the other incidents cited by Zamot – suggests that Zamot was subjected to an abusive work environment during his tenure in the FHO.[7] The credible proof establishes that Zamot was discharged, not because of any discriminatory animus, but because of his poor performance in preparing cases and representing the County in fair hearings, and his disrespectful demeanor towards female administrative law judges. While Zamot was understandably upset by the decision to terminate him despite his adequate performance reviews and the absence of any written warnings or discipline, the fairness of that decision is not within the reach of his Title VII claim. *See Alfano*, 294 F.3d at 377 ("[i]t is . . . important in hostile work environment cases to

---

[7] I do not read Zamot's Complaint to assert a separate claim for wrongful termination. Assuming that it could be read that way, Zamot has failed to meet his burden of proof on such a claim. I find that Zamot has not demonstrated a *prima facie* case of discrimination, and even if he has, he has not shown that the defendant's articulated reasons for his termination are pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination[;] [o]therwise, the federal courts will become a court of personnel appeals"); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (court's "role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments") (internal quotation omitted).

       In sum, Zamot has failed to satisfy his burden of proof on his Title VII claim of hostile work environment. The record is simply devoid of any proof that Zamot was subjected to a hostile work environment "because of [his] sex."[8] *See Oncale*, 523 U.S. at 79-80; *Alfano*, 294 F.3d at 374.

## CONCLUSION

       For the reasons stated above, judgment shall be awarded in favor of the defendant. The Clerk of the Court is hereby directed to enter judgment accordingly.

**IT IS SO ORDERED.**

                            *s/Marian W. Payson*
                               MARIAN W. PAYSON
                        United States Magistrate Judge

Dated: Rochester, New York
       September   21  , 2010

---

    [8] Because I find that Zamot's work environment was not hostile or abusive, I need not address whether there is a basis for imputing the challenged conduct to his employer, the DHS.